UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DAVID McCALLUM,

                  Plaintiff,

   -against-

 

THE CITY OF NEW YORK,
LORRAINE BUTTA, as Administrator of the Estate of
JOSEPH BUTTA, deceased, DETECTIVE FRANK
O'KEEFFE, and JOHN DOES and/or JANE ROES 1-10,
said names being fictitious

                 Defendants.
------------------------------------------------------------------------X

**AMENDED
COMPLAINT**

15 cv. 5894

**JURY TRIAL
DEMANDED**

       Plaintiff, **DAVID McCALLUM** ("Plaintiff"), by his attorneys, CUOMO LLC,

complaining of the Defendants, respectfully alleges, upon information and belief, as

follows:

## NATURE OF THE ACTION

1. This is a civil action, pursuant to 42 U.S.C. §1983 and §1988, and state law seeking

   monetary damages for Plaintiff, DAVID MCCALLUM, due to his false arrest, false

   imprisonment, malicious prosecution, wrongful and unjust conviction, violation of his

   civil rights under the United States and New York State Constitutions and his nearly

   twenty-nine (29)  year wrongful imprisonment caused by the pervasive misconduct,

   deliberate indifference, negligence, malfeasance and a pattern of unconstitutional

   behavior by the named defendants.

2. Each of the named defendants herein are jointly and severally responsible for the acts

   and omissions that led to the damage endured by Plaintiff.

## PROCEDURAL HISTORY

3. This case arises from the acts or omissions of the defendants. Details of said acts or omissions are as follows: Plaintiff  was convicted under Kings County Supreme Court Indictment 6640/1985 of Murder in the Second Degree; Kidnapping in the First Degree; Robbery in the First Degree; Criminal Possession of a Weapon in the Second Degree and Robbery in the Third Degree on or about October 27, 1986.  He was sentenced on or about November 17, 1986, to 25 years to Life on the Murder charges with other sentences on the related charges to run concurrently.  He had been incarcerated since his arrest on this matter on October 27, 1985.  Based upon evidence previously known to the defendants and others and based on new evidence more recently obtained, the plaintiff's convictions on all charges were reversed and vacated on October 15, 2014. The indictment which led to those charges, convictions and sentences was also dismissed that date by Kings County Supreme Court Judge Matthew D'Emic. A copy of the minutes of the proceeding wherein his conviction was overturned and reversed is attached hereto as exhibit A. A copy of the dismissal order is attached as exhibit B.

4.     The District Attorney of Kings County ("KCDA"), under the newly elected District Attorney, the Hon. Kenneth P. Thompson, joined in the motion to vacate the convictions and dismiss the indictment, and acknowledged that the case against Mr. McCallum and Stuckey should not have been brought in the first place.

5.   The District Attorney acknowledged that the office had no confidence in the confessions and that there was "unmistakable and unrefutable" evidence that the

*Amended Complaint of David McCallum*

confessions "were not voluntary recollections of the two defendants but were rather the product of improper suggestion, improper inducement and perhaps coercion."

6. Plaintiff's conviction for murder, kidnapping, criminal possession of a weapon and related charges was based primarily on the false and coerced confession obtained by the defendants and by their failure and refusal to properly and thoroughly investigate the case; Defendants intentionally, maliciously and/or negligently ignored evidence and leads that established that the Plaintiff did not commit the crime and that others were involved in the crime.  Furthermore, defendants withheld information from the Plaintiff and his counsel that would have either exonerated Plaintiff or resulted in a Not Guilty verdict at trial. The defendants had no physical evidence; no DNA evidence; no identification; and no fingerprint evidence at trial linking the Plaintiff to these crimes. The defendants knew, should have known or had reason to know that Plaintiff was innocent but ignored that knowledge and proceeded to arrest, prosecute and try Plaintiff anyway.  Defendants brought the case forward despite their knowledge that there was no probable cause to arrest, detain and prosecute the Plaintiff or his co-defendant Willie Stuckey.

7. This lawsuit seeks to hold the defendants liable for the above misconduct under the federal civil rights statute, 42 U.S.C. §1983 et seq. and New York State common law. The unlawful actions of these police detectives and other various members, servants, employees, and agents of City and State agencies documented in this lawsuit resulted from violations of the constitutional rights of criminal suspects in general and Plaintiff in particular.

8.  As the Plaintiff will demonstrate, the defendants coerced Plaintiff into giving a false and unreliable confession through their misuse of intimidation, duress, coercion, force, unreasonable deception, and their powers of arrest and interrogation.

9.      In addition, the Named Defendants engaged in numerous other acts of misconduct that they could reasonably foresee would contribute to the deprivation of Plaintiff's liberty.  The Named Defendants did not pursue two alternative suspects, even though (i) these suspects met the description of a witness and the perpetrators of eight similar crimes that had occurred in the area in the days prior to and including the kidnapping, (ii) Mr. Stuckey and Mr. McCallum did not meet this physical description, and (iii) other evidence tied the two alternative suspects to the crime.  Detective Butta or Detective O'Keeffe did not create a DD-5 of an interview of a witness who provided highly exculpatory evidence.  The Named Defendants also did not create DD-5s of four interviews with one of the alternative suspects, which also provided highly exculpatory evidence.  The Named Defendants focused on Mr. Stuckey and Mr. McCallum as suspects only because two self-interested individuals gave obviously false and misleading statements to the Named Defendants tying Mr. Stuckey to a gun, which was never found and then had Mr. Stuckey falsely implicate Mr. McCallum and Mr. McCallum falsely implicate Mr. Stuckey. The Named Defendants did not attempt to speak with those individuals mentioned by one of these self-interested witnesses who had falsely tied Mr. Stuckey to the gun, and, thus, did not even attempt to verify his story.  The Defendants knew or should have known that the information these witnesses provided was false and misleading.

10.    Based on the egregious conduct by the aforementioned Defendants in the case, Plaintiff was arrested when he was 16 years old and spent nearly twenty-nine (29) years incarcerated for a crime he didn't commit. He was labeled a violent felon and was wrongly held under arrest, detention and prosecution for approximately one year prior to his wrongful conviction. The resulting damages to Plaintiff are myriad and extraordinary. Plaintiff therefore seeks to hold Defendants accountable for their reprehensible and unconstitutional conduct and seeks compensation for the violation of civil rights, pain, suffering and loss caused by wrongfully being arrested; wrongfully being detained; wrongfully being prosecuted and wrongfully spending nearly twenty-nine (29) years behind bars.

## JURISDICTION

11.    This action is brought pursuant to 42 U.S.C. § 1983 and §1988, and under the common law of the State of New York.

12.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

13.    This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Comptroller of the City of New York within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since service of that notice, and no offer of settlement has been made.

15.     Plaintiff submitted to a hearing pursuant to New York General Municipal Law Section 50-h. Plaintiff has met all conditions precedent to filing a complaint against the defendants.

## VENUE

16.     Venue is proper under §28 U.S.C. §1391(b). The events giving rise to the claims asserted herein occurred in this judicial district and Plaintiff resides in this judicial district

## THE PARTIES

17.      At all times relevant herein, Plaintiff has been a resident of Kings County, located in the City and State of New York.

18.     Defendant THE CITY OF NEW YORK is a municipal corporation, duly existing and operating pursuant to the laws of the City, and State of New York.  The defendant CITY OF NEW YORK, as one of its mayoral agencies, operates, directs and controls the New York City Police Department; its supervisors; officers; employees; and agents.  .  It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers. The Kings County District Attorney is vested with the authority to make policy for the City concerning prosecutions and actions of assistant district attorneys in Kings County, New York.  The City is liable where Kings County prosecutors, pursuant to policy or custom, conceal exculpatory evidence and commit other wrongs in order to secure a conviction.

19.     JOSEPH BUTTA  (Tax ID No., 860275) was a New York City Police Officer and then Detective assigned to the 83rd Precinct; he passed away on September 6, 1994. On or about January 14, 1998, LORRAINE BUTTA was appointed Administrator of the Estate of Joseph Butta. A copy of the Order appointing her is annexed as Exhibit "C." He is sued here in his individual capacities.

20.     DETECTIVE BUTTA manufactured the prosecution by coercing Mr. Stuckey and Mr. McCallum into falsely confessing to crimes they did not commit. Detective Butta physically abused both boys, and told them that if they repeated on videotape what he had told them to say then they could go home.  As a result of Detective Butta's physical abuse, coercion, fraud and duress, both boys indeed made the videotaped confessions stating what Detective Butta had told them to say.

21.     Defendant DETECTIVE FRANK O'KEEFFE (Tax ID 863961), at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual capacities.

22.     JOHN DOES 1-10 are fictitious names assigned to those individuals employed by various City and State agencies who collaborated with; cooperated with; assisted; oversaw; trained; and otherwise worked with the Defendants who are also responsible for the wrongful arrest, detention, prosecution, conviction and imprisonment of Plaintiff.

23.  At all times, it is alleged that the Defendatns were acting under the color of State law , including the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

## STATEMENT OF FACTS

### THE CRIME

24 . This case involves the 1985 murder conviction of Plaintiff David McCallum, who at age 16 was convicted, along with his 16 year old co-defendant Willie Stuckey, for the murder of Nathan Blenner.  Unfortunately, Willie Stuckey died in prison in 2001. At Plaintiff's trial, the People presented no physical evidence of any kind tying the defendant to the crime. No weapon was recovered; no blood found on the clothes worn by the defendant; no identification of the defendant was made by two eyewitnesses to the crime; the defendant did not match the physical description given by the eyewitnesses; none of the fingerprints recovered in the vehicle in which the victim was abducted and carjacked matched the defendant's fingerprints.The sole piece of evidence tying the Plaintiff to the crime were the brief, false, videotaped confessions.

25.  On October 20, 1985, at approximately 3:00p.m., Nathan Blenner was abducted in front of his home at 111th Avenue. in the Ozone Park neighborhood in Queens, New York City.

26.  Two witnesses Gregory Prasad, age 10, and John Egan, age 11, reported that they looked out the window of a porch-like room at the front of Prasad's house and saw Nathan Blenner trying to start his 1979 black Buick Regal. Across the four lane street, two black males were walking toward the car from the rear, one on the street and one on the sidewalk. As the men were about to pass the car, they turned around and ran over to

8

the car windows.  The two men entered the car, pushed Mr. Blenner into the back seat, and drove off down 111th Avenue toward 117th St.  According to the boys, one of the black males was taller than the other.  Neither Gregory Prasad nor John Egan were able to identify Plaintiff or Mr. Stuckey as the black males who abducted Mr. Blenner.  Plaintiff and Mr. Stuckey were both 5' 5" tall.

27. Police from the 106th precinct canvassed the area and spoke with several people in the neighborhood.  One man reported seeing a black male drive off the Blenner vehicle at around 3PM; a woman named Kathy Hank said that at approximately 2:00 p.m. the date of the crime she was washing her car in front of her residence on 117th St, when she observed two black males walking north on 117th. She described both males as in their twenties.   One was 5'6, thin build.  The other was 5'10, with a thin build and one had hair in braids.  One of the males said, "That's a nice car." Ms. Hank replied, "If it's not here tomorrow, I'll know where to look."   The men continued walking north toward 111th Avenue. Neither Stuckey nor McCallum had braids and both were 5'5" tall.

28.  Ms. Hank clearly indicated that she could identify the two men and would be willing to go to the station to view mug shots.

29.   At approximately 3:11 p.m. on October 21, 1985, Officer Thomas Kaufer responded to a 911 call reporting a DOA at Aberdeen St. and Bushwick Ave.  Mr. Blenner's body was discovered in the rear of Aberdeen Park, a wooded area bordered by Evergreen Cemetery and a railroad yard. Nathan Blenner's body was lying face down with a gunshot wound to the rear of his head. Investigators from the 83rd precinct also recovered a pair of eye glasses coated in blood, an empty box of 22. cal ammunition a "U.S. Auto" matchbook, and a woolen blanket.

9

30.  On October 22, 1985 Dr. Eddy Lilavois, a physician with the Office of the Chief

Medical Examiner of the City of New York, conducted a post-mortem examination.  His

examination of the body determined the cause of death to be the gunshot to the head.

According to Dr. Lilavois, the bullet entered the back of the head, traveled on an upward

right trajectory, and exited higher and on the right of the entry. In addition, a bullet

fragment was found in the skull. On October 22, Nathan Blenner's brother Arthur went to

the medical examiner's office and identified the body.

31. On October, 22 1985, Defendant Detective O'Keeffe called Detective Flannagan of

Queens Central Robbery and requested any information that may indicate a pattern of

robberies by black males in which the complainant and auto are taken. Detective

Flannagan reported that in the 105th precinct there were eight such robberies between

1:40 a.m. on October 18, 1985 and October 20, 1985 at 5:45 a.m. In all instances the

perpetrators were two black males ages 18-20, one 5'6, the second 5'11 armed with a

gun.  This physical description matched the description given by Ms. Hank.  In all

instances, the complainant was robbed of property and the auto but was not abducted and

taken with the perpetrators.

 32. That same day, October 22, 1985 at 10:34 p.m., an officer assigned to the 81st

precinct responded to a report of three black youths who were thought to be breaking into

a car in a parking lot at the rear of 1615 Fulton St. in Brooklyn. Shortly thereafter, Nathan

Blenner's car, with the plates having been removed, was identified. The car showed signs

of being burned and the fire extinguished. Cecil Bessee, a security guard from a nearby

building, told police that he saw what he believed to be three black males attempting to

gain entry to the car. Mr. Bessee had asked for the keys and identification for the car and

one of the men said the car belonged to his brother. Mr. Bessee said that if they could not produce proper papers for the car he would call the police. Then Mr. Bessee went into the building to call the police and returned with another guard, William Terrell, and found the car burning. The guards threw water on the car to extinguish the fire.

33.  Investigators recovered a Nankee kerosene can used to start the fire in the car, two "Meter Not Working" signs, a paper bag of miscellaneous papers, cigarette butts, a white plastic bag of "material", material debris from the sidewalk, as well as a towel and large cloth in the trunk.   Numerous fingerprints were lifted from various surfaces though only on the front and left side of the car and on the kerosene can. At trial, Defendant Butta testified that some of the prints belonged to members of the Blenner family and others to Damon McIntyre, a man who resided in the area and was identified as one of the people hanging around when the car was burning. The prints were also compared to other youths hanging around when the car was burning. The prints that were not identified did not match these youths or the Plaintiff or Mr. Stuckey.

34. An Amoco credit card receipt found in the Blenner vehicle establishes that in the early morning hours of October 21, 1985, the day following the daytime abduction of Nathan Blenner, an Amoco credit card belonging to Mr. Blenner's employer was used to buy gas from a gas station on 720 New York Avenue, Brooklyn New York.

35. The relevance of this receipt is to call into the question the likelihood that two unlicensed sixteen-year-old boys (who did not own cars and who had never taken Driver's Education) would be able to drive a car from the Blenner household in Queens into Brooklyn, drive it around for several hours in parts unknown, get gas in East Flatbush with a credit card (requiring them to see the attendant as there were no self-

11

*AMENDED COMPLAINT OF DAVID MCCALLUM*

serve credit card pumps in 1985) and then eventually dump the car some time later.  It is also telling that in their purported confessions neither Mr. Stuckey nor Plaintiff mentioned getting gas while discussing traveling in the car.

36.  On October 24, 1985, at 11:00, Kathy Hank, mentioned above, reported her red 1976 Buick Regal stolen from in front of her residence exactly where she had been washing it when she saw the two black males in the neighborhood about an hour before Nathan Blenner was abducted.

37.  The following day, October 25, 1985, two black males, one of whom had braided hair matching the perpetrator described by Ms. Hank, were arrested for robbery in the 104th precinct. The first, Herman Munford, (AKA Shorty), was 19 years old.   The second, Terrence Heyward, was 18 years old.  Mr. Heyward lived at 1148 Halsey St. in Brooklyn, not far from where Nathan Blenner's body was discovered.   He told the police that on October 20, 1985, the day of the abduction, he went to work at what he called "Pops Hardware" on Wilson Ave.   The reporting officer knew this to be the same store (Connie's) where the Nankee kerosene can found inside Nathan Blenner's car was sold.

38.  Detective Butta, who was investigating Nathan Blenner's murder, was called in to interview Munford and Heyward.  Among other things, Mr. Heyward told police that he knew a black male called "Supreme" who was trying to sell a gun he claimed had "a body to it."   Heyward said the gun belonged to "James" who resided at 564 Central Ave. along with Keith Brown, another employee of the store where the kerosene can was sold and who had been interviewed earlier in the case.

39.  Nowhere in the DD-5 of this interview is it mentioned that Herman Munford – by the time of that interview – had already been questioned by the Police at least twice about this incident.

40.  At some point that same day, October 25, 1985, Detective Butta questioned James Johnson.  James Johnson told Detective Butta that during an incident in Medina Grocery Store on Central and Halsey he fired some shots in the store. He fled and took the gun to his Aunt Lottie's house  Someone from his aunt's house, in turn, gave the gun to someone named "Jamie" or "Jaime" (hereinafter referred to as "Jamie"). Mr. Johnson said that several days after October 22, 1985 he ran into Willie Stuckey and that Mr. Stuckey, whom Mr. Johnson identified as having the nickname "Supreme," told him he had gotten his gun from "Jamie" and he could get it back for Mr. Johnson. Mr. Johnson said he did not want it.

41.   According to Mr. Johnson's trial testimony, Detective Butta promised to forget about the shooting in the Medina Grocery Store if he testified to this story.  According to available reports, no one had ever spoken with "Aunt Lottie" or "Jamie."

42. On October 27, 1985, Detective Butta picked up Willie Stuckey, 16 years old, at 6:00 or 7:00 p.m. and brought him to the 83rd precinct. According to Detective Butta's account, he asked Mr. Stuckey if he knew anything about the incident in Aberdeen Park and Mr. Stuckey said "yes." He then showed Mr. Stuckey a photo of Nathan Blenner's car and Mr. Stuckey said he knew about it. He advised Mr. Stuckey of his rights and Mr. Stuckey voluntarily confessed to the crime.

43.  Mr. Stuckey on the other hand, claimed he was handcuffed in a room in the precinct while being questioned by Detective Butta and two other detectives. He claimed that when Detective Butta asked him if he knew anything about the car, he denied knowing anything. Mr. Stuckey claimed that Detective Butta hit him three or four times during the course of the interrogation.  Detective Butta told him if he made a statement on tape blaming Plaintiff for the shooting, he could go home. Detective Butta then went over the statements he was to make in the videotape, suggesting all of the facts. That evening, ADA David Rappaport, went to the 83rd precinct to take a videotaped statement from Mr. Stuckey. He finished recording Mr. Stuckey's statement at approximately 9:15 or 9:30.

44. In the meantime, and while Mr. Stuckey remained in custody, Detective Butta went to Mr. Stuckey's home to look for the gun that, according to the confession, was supposed to be under his mattress. However, no gun was ever recovered. Detective Butta claims to have called back to the precinct and spoken with Mr. Stuckey who informed him that one of his friends may have taken it the day prior. Detective Butta, Detective O'Keeffe, and James Johnson then went to a location redacted from the report and spoke to a person or persons whose names have been redacted from the report. This person claimed to know nothing of the gun so the officers began looking for Plaintiff.  At 10:55 pm, Plaintiff, 16 years old, was picked up and according to Detective Butta, advised of his rights before he volunteered to speak with him regarding October 20, 1985. Plaintiff then purportedly freely confessed to his involvement.

45.  Plaintiff was confronted by Detective Butta in front of a store on Wilson Ave at about 10:30p.m. that night. Detective Butta handcuffed him and did not tell him why he was being brought to the precinct. On the way to the precinct, one of the detectives

threatened to slap him. Upon arriving at the precinct, he was read his rights and asked if he knew anything about the incident on October 20, 1985. He said he knew nothing and Detective Butta slapped him in the mouth drawing blood. Willie Stuckey was then brought into and out of the room and Plaintiff was told that Stuckey had implicated him in the above-mentioned incident. At some point Detective Butta picked up a chair and threatened to hit McCallum with it if he did not give him the facts. Detective Butta asked again, promising that if he blamed Stuckey for the shooting, Plaintiff could go home. Finally, Plaintiff succumbed to the duress, coercion, fraud and deception and agreed to make a statement. Detective Butta "lead [him] to the facts and [he] just answered them." At approximately 12:20a.m., the ADA taped McCallum's confession.

46. Both defendants immediately recanted their confessions and pled not guilty, opting for trial and rejecting a plea bargains of fifteen years to life. As previously stated, the confessions contained many inconsistencies; false fed facts; and fabrications. At the time of Mr. Stuckey's and Mr. McCallum's trial in 1985, the study of false confessions was in its infancy. In the past two decades, however, social science research into the phenomenon of false confessions has grown exponentially, increasing the understanding of the causes and consequences of false confessions. According to the Innocence Project, the advent of DNA testing has resulted in 318 exonerations to date, approximately 30% of which involve false confessions. In cases of homicides without sexual assaults, false confessions are the leading cause of the DNA exonerations, doubling (62%) the percentage of DNA exonerations (31%) due to mistaken eyewitness identifications. Many of the false-confession exonerations involve teenagers like Plaintiff and Mr. Stuckey who are more vulnerable to police pressure and more likely to confess to crimes they did not

commit when pressured.  In fact, two of the most highly-publicized New York-area exonerations of recent times – the Central Park Jogger Case and Marty Tankleff's case -- both involved young men confessing to crimes they did not commit.

47.  Professor Steven Drizin, a leading authority on false confessions, and the former Legal Director of the Northwestern University School of Law's Center on Wrongful Convictions, has examined the tapes in this case and found them troubling and containing many of the key indicators of false confessions. As in the Central Park Jogger case, there are numerous inconsistencies between Stuckey's and McCallum's confessions (e.g. the numbers of shots fired, the route followed after the shooting, what happened to the car). Neither Stuckey nor McCallum were able to lead the police to any evidence that corroborated the confessions, including the murder weapon, Mr. Blenner's wallet, and a credit card that was stolen and used by the perpetrators to purchase gas.  There is also evidence that the police "contaminated" the confessions by feeding facts to the boys that only the police and the true perpetrators should have known. The Plaintiff and Mr. Stuckey provided very little details about the crime and offered no new evidence about the crime to the police or the KCDA.   Indeed, Mr. Stuckey and Mr. McCallum's confessions were extremely short - Mr. Stuckey's statement was approximately 9 minutes and 16 seconds; Mr. McCallum's statement lasted approximately 3 minutes and 13 seconds- and provided very few details about the crime at all.  Many of the details provided wre wrong – for example, in his videotaped confession Mr. McCallum states the victim flailed his arms after being shot but the victim was in fact found with his arms under his body with no indication that they had flailed as indicated in the video confession. At one point in the brief confession, Mr. McCallum indicates that the victim

fell backward after being shot when he was found face down.

48.  Detective Butta gave false testimony at Mr. McCallum's and Mr. Stuckey's trial. According to Detective Butta's trial testimony, he asked Mr. Stuckey if he knew anything about the incident in Aberdeen Park and Mr. Stuckey said "yes."  He then showed Mr. Stuckey a photo of Nathan Blenner's car and Mr. Stuckey said he knew about it. Detective Butta advised Mr. Stuckey of his rights and Mr. Stuckey supposedly promptly volunteered his confession to the crime.

49.  In fact, Mr. Stuckey was handcuffed in a room in the precinct while being questioned by Detective Butta and two other officers.  Upon information and belief, one of these two other detectives was Detective O'Keeffe.  When Detective Butta asked Mr. Stuckey if he knew anything about the car he denied knowing anything. Detective Butta then hit him three or four times during the course of the interrogation. Detective Butta told Mr. Stuckey if he made a statement on tape in which he said "everything that he [Detective Butta] told me to say" then he could go home. Detective Butta then went over the statements Mr. Stuckey was to make on videotape, telling Mr. Stuckey the facts he was supposed to say. Mr. Stuckey testified that he would have parroted anything Detective Butta told him to say when he was told that making such statements would allow him to go home.

50.  Upon information and belief Detective Butta or his agent contacted the Kings County District Attorney's office and requested that an Assistant District Attorney come to the police station to take Mr. Stuckey's confession.

51.  That evening, ADA  Rappaport went to the 83rd Precinct to take the videotaped statement from Mr. Stuckey. Prior to taking the videotaped confession ADA Rappaport

met with Detective Butta, and Detective Butta informed ADA Rappaport that Mr.
Stuckey was willing to speak with him.  ADA Rappaport took Mr. Stuckey's videotaped
statement, and Detective Butta was in the room the entire time.  ADA Rappaport finished
recording Mr. Stuckey's statement at approximately 9:15 to 9:30 p.m.

52.  By, *inter alia*, physically abusing and coercing Mr. Stuckey, and telling him what
false statements to make on his videotaped confession —which Mr. Stuckey subsequently
made—Detective Butta initiated the prosecution by creating what he knew was false
information and fabricated evidence that is likely to influence the grand and petit juries.
Detective Butta's purpose was to obtain Mr. Stuckey's unlawful arrest, wrongful
conviction, and unjust imprisonment.

53.  By, *inter alia*, causing ADA Rapport to come take Mr. Stuckey's false confession,
and forwarding DD-5s with this false confession to prosecutors, Detective Butta
forwarded false and fabricated information to prosecutors with the express purpose of
causing criminal proceedings to be instituted against Mr. Stuckey, even though he could
reasonably foresee that his actions would contribute to the prosecutors' subsequent
decision to prosecute Mr. Stuckey and obtain his conviction and imprisonment.

54. Detective Butta also gave false testimony related to Mr. McCallum at Mr.
McCallum's and Mr. Stuckey'strial.  According to Detective Butta, he found Mr.
McCallum that evening, and brought him to the precinct at approximately 10:55 p.m.
According to Detective Butta, he advised Mr. McCallum of his rights before Mr.
McCallum agreed to speak with him regarding what occurred on October 20, 1985. More
specifically, Detective Butta testified that, after he had read Mr. McCallum his rights and
had showed Mr. McCallum that Mr. Stuckey had been arrested earlier that evening, Mr.

McCallum freely confessed.

55  In fact, Mr. McCallum was confronted by Detective Butta in front of a store on Wilson Ave at about 10:30 p.m. that night. Detective Butta handcuffed him, and did not tell him why he was being brought to the precinct. On the way to the precinct, one of the detectives threatened to slap Mr. McCallum. Upon information and belief the detective who threatened to slap Mr. McCallum was Detective O'Keeffe. Upon arriving at the precinct, he was read his rights and asked if he knew anything about the incident on October 20, 1985. When Mr. McCallum said he knew nothing, Detective Butta slapped him in the mouth, drawing blood.  Detective Butta showed Mr. McCallum that Mr. Stuckey had been arrested, and told him that Mr. Stuckey had told the police a story about the kidnapping and murder. At some point, Detective Butta picked up a chair and threatened to hit McCallum across the head with it if he did not give him the facts. Continuing to follow the same approach he used on Mr. Stuckey, Detective Butta promised Mr. McCallum that if he blamed Mr. Stuckey as the shooter, Mr. McCallum could go home.  Finally, Detective Butta "lead [sic] [him] to the facts and [he] just answered them."

56.   When ADA Rappaport was still at the police station Detective Butta informed him that Mr. McCallum was willing to speak with him.

57. Sometime after 12 a.m., ADA Rappaport taped McCallum's confession, and Detective Butta was in the room the entire time.

58.  By, *inter alia*, physically abusing and coercing Mr. McCallum, and telling him what false statements to make on his videotaped confession —which Mr. McCallum subsequently made—detective Butta initiated the prosecution by creating what he knew

was false information and fabricated evidence that is likely to influence the grand and petit juries to convict Mr. Stuckey and Mr. McCallum. Detective Butta's purpose was to obtain Mr. McCallum's and Mr. Stuckey's unlawful arrest, wrongful conviction, and unjust imprisonment.

59. By, *inter alia*, causing ADA Rapport to come take Mr. McCallum's confession and forwarding DD-5s with this false confession to prosecutors, Detective Butta forwarded false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Mr. Stuckey and Mr. McCallum, even though he could reasonably foresee that his actions would contribute to the prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

60. Mr. McCallum and Mr. Stuckey succumbed to the Named Defendants' coercion and pressure to confess. By the time each had agreed to make the videotaped statement for the ADA, each had been subjected to Detective Butta's physical abuse, psychological duress, coercion, and outright fraud and deception.

61. Mr. Stuckey, in his initial confession to the police, "confessed" to the fact that he and Mr. McCallum were the two individuals who passed Ms. Hank's residence and noted her red Buick, and that Mr. McCallum said "that's a nice car." However, subsequently at the trial, the KCDA argued that the two individuals who noted Ms. Hank's car were *not* the individuals who abducted and murdered Mr. Blenner; i.e., that the individuals who passed Ms. Hank's car were not Mr. Stuckey and Mr. McCallum. The ADA essentially admitted that Mr. Stuckey had falsely "confessed" to passing Ms. Hank's residence before the Blenner kidnapping. The fact about the Hank encounter could only have been fed to him by the Named Defendants.

## New evidence is discovered

### DNA and Fingerprint Evidence

62.  Our investigation into this case revealed several pieces of evidence that were never tested for DNA material as that science did not exist at the time of the conviction.

63.  In particular, after the car was recovered, numerous cigarette butts and a marijuana roach were found inside the ashtray of the car.  As far as Plaintiff can ascertain, Plaintiff's defense attorney never received the results of any hair, fiber, or blood analyses that may have been conducted prior to his trial.

64. We do know, however, that none of the many fingerprints obtained matched those of Plaintiff or Mr. Stuckey. In 1985, the police determined that one print, taken from the left side of the car, matched one of three boys seen near the car just before it was set on fire. Similarly, a palm print lifted from the kerosene can, which police believed was used in the arson of the car, was not that of Mr. McCallum or Mr. Stuckey.

65.   Recent print comparisons conducted by KCDA have revealed two additional matches.  One, also obtained from the outside of the car, matched another of the three boys around the car.  The second, obtained from a "stub" card found inside the car, matched someone whose name does not appear anywhere in the DD5s and who died in 1992.

66.  Most significantly, upon motion by Plaintiff's counsel, the KCDA agreed to conduct DNA analysis of the nine cigarette butts found in the car.  Two of these butts matched Roland Miley, a person who is in the New York DNA registry on the basis of past criminal conduct.  This person has alternatively told Det. Patrick Lannigan of the KCDA Conviction Review Unit that he does not know how two cigarettes carrying his DNA

21

found their way into Mr. Blenner's car or that he must have flicked the butts into the car as he walked past it on his way to school, an obvious fabrication. He has recently told Plaintiff's attorney and investigator that he has no idea how the cigarette butts ended up in the car and that it must be a mistake.

67.  None of the new DNA and fingerprint evidence ties the Plaintiff to the crime.

**Herman Munford**

68.  Ms. Hank's description of two men, one 5'6" and one 5'10" with braids was sent out to other police precincts by Butta's partner Detective O'Keefe. The initial detective report about the crime lists Ms. Hank's description of the two men as the description of the suspects of the Blenner kidnapping.  This is a clear indication that the NYPD believed that whoever accosted Ms. Hank was also responsible for the Blenner kidnapping that occurred around the corner and shortly thereafter.

69.  On October 25, 1985, Detective Johnny Wilder of the 105th precinct in Queens called Detective O'Keefe to say that two suspects matching Ms. Hank's description, including one with braided hair, were in the station.  O'Keefe and Butta went to interview the suspects. One, Terence Heyward, gave them a lead about an individual nicknamed "Supreme" who was trying to unload a gun "with a body to it" and that the gun was "Jamie's."  This led police to a man named James Johnson who later fingered Stuckey as the boy named "Supreme."  Stuckey then claimed McCallum was "Supreme."

70. Both were suspected of a string of eight separate carjackings in the 48 hours prior to the Blenner carjacking, and Heyward had worked in the very hardware store from which the kerosene can that was used to burn the Blenner automobile was obtained. There is no explanation in the DD-5s why these two individuals were not pursued further as suspects

in the Blenner homicide. There is no indication in the DD-5 that the second suspect, Herman Munford was even questioned at that time.

71. Plaintiff's investigator tracked down Munford's sister.  The sister told our investigator that Munford was detained and questioned by Brooklyn police several  times before anyone was arrested for the Blenner homicide. No DD-5 reflects these incidents.

72.  Munford was then located in Riker's Island where he was detained on a recent re-arrest.  Plaintiff's attorney and investigator interviewed him on January 30, 2014. Munford confirmed being questioned and detained by the police about the Blenner homicide – except that there were not just three (as his sister told the investigator) but four contacts with the NYPD about the Blenner homicide.  The first was when Munford was riding his bike past the crime scene when police first found the Blenner body in Aberdeen Park. The second was a few days later when he was questioned at his home then brought down to the 83rd Precinct for questioning. The third was a day or so after that when he was placed in a room with a one-way mirror. Finally, he was brought down one last time and again questioned.

73. The defense was never told at the time of the Plaintiff's trial about these contacts with Mr. Munford. With this knowledge, the defense could have put forward Mr. Munford and Mr. Heyward as potential perpetrators of the Blenner kidnapping and murder. Furthermore, just recently – for the first time- Plaintiff was given audio recordings of an interview with Herman Munford; James Johnson; Gregory Prasad and John Egan; participated in by Joseph Butta and others which were never documented or given over to the defense at the time of trial.

**Kathy Hank**

74.   Plaintiff's attorney was able to track down and interview Ms. Hank. She informed him that after she called the police to report the stolen car, she was visited by a Brooklyn detective who brought mug books of robbery arrestees from the Brooklyn precinct handling the Blenner murder.  She spent time going through all of the mugbooks but could not identify anyone. But, more importantly, no DD-5 exists of this visit to Hank and Butta testified at trial that Hank told him she could not identify anyone. This visit and search of mugbooks was also confirmed by Ms. Hank's mother and husband, who was her boyfriend at the time of the Blenner kidnapping and murder.

75.   Having been arrested for robbery in the 83rd precinct prior to their arrest for the Blenner homicide, Plaintiff and Mr. Stuckey's mugshots would have likely been in the mugbooks presented to Ms. Hank. Ms. Hank's husband (who was then her boyfriend) and her mother also confirmed that this visit and viewing of mugbooks occurred after Ms. Hank had reported her car stolen.

76.   Upon information and belief, the Named Defendants did not forward this exculpatory evidence to prosecutors, i.e., upon information and belief, they did not tell prosecutors that one of them had conducted this interview, and did not tell prosecutors that Ms. Hank had looked at mug books that likely contained Mr. McCallum's and Mr. Stuckey'smugshots and was unable to identify anyone.

77.   By not creating a DD-5 of this interview with Kathy Hank and failing to forward this information to prosecutors and Mr. McCallum's and Mr. Stuckey'scounsel the Named Defendants withheld evidence that was material to Plaintiff's being found guilty and receiving punishment.

78.   Not creating a DD-5 of this interview with Kathy Hank and failing to forward this information to prosecutors and the defense counsel is misconduct that the Named Defendants could reasonably foresee would contribute to the deprivation of Plaintiff's liberty.

79.  Equally important is the way Joseph Butta dealt with the "Kathy Hank" issue at trial. He distanced the two individuals who accosted Ms. Hank from the two individuals who abducted Nathan Blenner. This is problematic and evidence of the falsity of the confessions because Willie Stuckey was made to confess to the facts of the Hank incident in his initial statement to the police.

80. Detective Butta engaged in a twisting of the actual facts to hide the more obvious conclusion: *that whoever accosted Ms. Hank also abducted and killed Nathan Blenner*. In fact, this was Defendant Butta's own initial belief as evidenced by the first DD-5 he created on the case which had the Hank description incorporated in it as the description of the perpetrators of the Blenner kidnapping.  It was also Defendant O'Keeffe's belief as he circulated the Hank description to area precincts.

81.   The first time Kathy Hank is mentioned is during the cross-examination of Detective Butta by Mr. Stuckey's lawyer, Mr. Mandelcorn.  Upon hearing Hank's name, immediately, ADA Bjorneby objected and asked for a sidebar which was not recorded by the stenographer.  (*Id.* at 430). The judge then questioned Det. Butta about Kathy Hank:

THE COURT: Did you talk to Ms. Hank?

Butta: Yes, I did.

THE COURT: And was there talk about braided hair?

Butta: Yes; she told me …

THE COURT: Don't tell me she told you. Approximately, what time did she indicate that the incident occurred?

Butta: I think about 12:00. I don't remember exactly, I have to look for it here. (presumably looking at the DD-5 which reflects 2:00pm as the time)

82. Mr. Mandelcorn tried to follow up with Detective Butta on cross about his conversation with Kathy Hank.  First, Detective Butta claimed that Hank was unable to give him a description, directly contradicting his earlier testimony to the judge and the DD-5 which indicated Hank was willing to view photos as she could identify the perpetrators.  Then Mandelcorn asked Detective Butta specifically if Kathy Hank gave him a "description of a male black in his twenties, five foot six, thin build, and a second male black, five foot ten, thin build with hair in braids?" Detective Butta changed his story a second time, telling Mandelcorn that he didn't remember. Butta was never confronted with or asked to refresh his recollection with the DD-5.

83. Mr. Mandelcorn then specifically asked Detective Butta one question that should have elicited from him the fact that he had showed Cathy Hank photographs in a mugbook. But again, Detective Butta ignored the question about the photos:

Mandelcorn:  And it's your testimony the next day she couldn't give you a description and wouldn't view photos?

Butta: She said she was cleaning her car, they passed, she didn't look at them long. She just glanced up when they said something about her car and continued cleaning her car.

84.  This answer is non-responsive and it was not pursued.  This testimony of Butta directly contradicts Ms. Hank's recorded statement in the DD-5 that she got a good look at them and was willing to view photographs. It also makes no sense why he would show her mugbooks if she said she could not identify anyone.

85.  Mr. McCallum's and Mr. Stuckey's defense attorneys allowed Detective Butta's misleadingand false testimony as described in paragraphs 63-68 above, to go unchallenged, as they did not call either Ms. Hank or the police officer with whom she spoke in the 106th Precinct to testify to refute Detective Butta's testimony. Neither did they challenge Butta with the DD-5s which directly contradicted his sworn testimony. The prosecutor presumably had the DD-5 that stated the interaction took place at approximately 2 p.m., and, thus, knew or should have known that the interaction took place at approximately 2 p.m.  Yet, the prosecutor understood the significant negative effect Detective Butta's misleading testimony had on Mr. McCallum's and Mr. Stuckey'scase, and compounded the harm by emphasizing the incorrect time in his summation.  Specifically, he argued that the information Ms. Hank provided to the police was irrelevant because she had interacted with the men "several hours before" the kidnapping.  Thus, the prosecutor and Detective Butta both distorted the facts to hide the obvious conclusion that whoever passed by Ms. Hank's apartment and noticed her car one to one and a half hours before the kidnapping were prime suspects for the kidnapping and murder of Mr. Blenner

86.. The new evidence that Ms. Hank was willing to and did in fact view mugbooks also places Det. Butta's credibility and truthfulness into serious doubt. Keeping this fact from the defense by not creating a DD-5 about the contact and by not telling the defense of

27

potentially exculpatory evidence is yet another cause of the wrongful conviction of Plaintiff.

**"Aunt Lottie"**

87. Other than the video confessions, the only other evidence connecting Mr. Stuckey to the crime was the testimony of James Johnson.

88. James Johnson was asked by Mr. Mandelcorn only one or two questions about the very generous deal he received in exchange for his testimony against the Plaintiff and Mr. Stuckey. Plaintiff's attorney barely asked Mr. Johnson any questions on cross.

89. Johnson also told the defense trial investigator that Plaintiff and Mr. Stuckey did not do the crime and that Terrence Heyward was the driver of the car. This was never pursued further and was never brought up during the cross of Johnson by any defense attorney.

90. The Named Defendants never spoke or even attempted to locate and speak with "Aunt Lottie" or "Jaime."  There are no DD-5s in which the Named Defendants attempt to locate or speak with either of these individuals.  Further, according to the current Kings County Conviction Review Unit, "The police never attempted to converse with Aunt Lottie or Jaime (a) to confirm Johnson's story about the chain of custody of the gun, (b) to try to locate the firearm, or (c) determine whether Mr. Johnson was talking about real people or figments of his imagination."

91. Recently, when the current KCDA's Conviction Review Unit was re-investigating this case "Aunt Lottie" was located and spoken to. She told the KCDA CRU that she never held a weapon for her nephew and never gave a weapon to Mr. Stuckey or "Jamie" or anyone.

92.  Aunt Lottie's recent statement establishes that James Johnson lied to the police and lied on the stand about the circumstances surrounding the alleged murder weapon.

93.   Given that (i) both Mr. Heyward and Mr. Johnson had a motivation to lie – Heyward to point detectives away from himself and towards others as suspects, and Johnson to secure a deal related to the Medina grocery store shootings – and (ii) the gun – the evidence Heyward and Johnson claimed linked Stuckey to the crime – was never found, the Named Defendants' failure to attempted to locate and interview "Aunt Lottie" and "Jaime" is misconduct that they could reasonably foresee would contribute to the deprivation of Plaintiff's liberty.

94.  In addition, relying on Mr. Heyward and Mr. Johnson's non-credible statements linking Mr. Stuckey to the gun, (which was never found), is misconduct that the Named Defendants could reasonably foresee would contribute to the deprivation of Plaintiff's liberty.

The KCDA's Failure to Turn Over *Brady* and *Rosario* material to Mr. Stuckey and Mr. McCallum

95.  In an unusual action, on January 20, 1986, well after Mr. Stuckey's arrest on October 27, 2015, but before the trial in October of 1986, Herman Munford was interviewed at the 83rd Precinct by an assistant district attorney in the KCDA's office. This interview was audiotaped.

96.  In this interview, Munford stated that on October 23, 1985, in "the park," he saw David McCallum engaged in conversation with Terrence Heyward. Mumford stated that he  heard none of the substance of the conversation, but he saw McCallum with a handgun tucked in his (McCallum's) pants waistband.

97. Detective Butta is recorded as being present for Munford's interview, but he did not write up a DD-5 or make any other report or note of the interview.

98. Upon information and belief, trial counsel for the Mr. Stuckey and Mr. McCallum never received the tapes or transcripts of this interview, or were aware that the interview took place.

99. The fact that a prosecutor in the KCDA's office interviewed Herman Munford is itself *Brady* material/exculpatory information. The police initially thought Mr. Munford might have been a suspect in the Blenner murder and kidnapping, based on information in the DD-5s  in paragraphs 42-47  of this Complaint he should have been an alternative suspect, and the fact KCDA's office took the unusual action of interviewing him well after Mr. McCallum's and Mr. Stuckey's arrests is itself exculpatory information that Mr. McCallum's and Mr. Stuckey's lawyers could have used to put Mr. Munford forward as an alternative suspect at trial.

100. The KCDA office's failure to turn over the tapes or transcripts of this interview or let Mr. McCallum's and Mr. Stuckey's counsel know that the interview took place is a *Brady* violation.

101. On April 24, 1986, well after Mr. McCallum and Mr. Stuckey's arrest on October 27, 2015, but before the trial in October of 1986, James Johnson was interviewed at the 83rd Precinct by an assistant district attorney in the KCDA's office. This interview was audiotaped.

102. Detective Butta is recorded as being present for Johnson's interview, but he did not write up a DD-5 or make any other report or note of the interview.

103.  In this interview, Johnson said that Willie Stuckey got Johnson's gun from Jamie, who in turn had received the gun from Johnson's Aunt Lottie. Johnson claimed to know Stuckey procured the gun from Jamie because Stuckey told him he had. Johnson also stated that Stuckey had tried to return the gun to Johnson but Johnson didn't want it because "[Stuckey] was shooting around Hancock, shooting people". Johnson also stated that Stuckey met up with McCallum and they "did a crime with the gun."

104.   At trial Johnson was called as a witness for the prosecution and testified to these facts.  Specifically, Johnson testified that (i) he gave a gun to his "Aunt Lottie," (ii) his "Aunt Lottie" and "Jamie" were friendly, and (iii) Mr. Stuckey told him (Johnson) that he got a gun from 'Jamie" and had returned it to "Jamie."  At trial he did not mention that Stuckey was "shooting around Hancock shooting people"

105.  The KCDA's recorded interview of Johnson on April 24, 1986, was *Rosario* material since it is a recorded statement by a prosecution witness which relates to the subject matter of the witness's testimony.  The KCDA's failure to turn over this statement to Mr. McCallum's and Mr. Stuckey's attorneys was a *Rosario* violation.

**The Named Defendants' Malice and Deliberate Indifference**

106. By physically abusing and coercing Mr. Stuckey and Mr. McCallum into falsely confessing Detective Butta demonstrated his indifference to Mr. Stuckey's innocence, reckless disregard of Mr. Stuckey's rights, and malice.

107. The Named Defendants' failed to undertake even basic investigation tasks and deliberately ignored investigative leads that would have proved Plaintiff's innocence, which further confirms their indifference to Plaintiff's innocence, reckless disregard of Plaintiff's rights, and malice.  For instance they did not pursue Heyward and Munford as

suspects even though (i) an hour to an hour and a half before Mr. Blenner's kidnapping

individuals who met their physical description were around the corner from the site of

abduction and were interested in a car, which was the same model as the car Mr. Blenner

was in when he was abducted; (ii)  Mr. Stuckey and Mr. McCallum did not match a

description of these men; (iii) Heyward and Munford also fit the description of the

perpetrators of eight other carjackings that had occurred in Mr. Blenner's area  in the

days prior to and including Mr. Blenner's abduction; (iv) Heyward worked at the store

that sold the kerosene can that was used to burn Mr. Blenner's car; and (v) Heyward lived

near the location where Mr. Blenner's body was discovered; (vi) Munford was at the park

on the night Mr. Blenner's body was discovered. The police also

   a.  did not create a DD-5 of the interview of Kathy Hank that provided the

       highly exculpatory evidence that Ms. Hank had looked  at mug books that

       likely contained Mr. Stuckey and McCallum's mugshots, but could not

       identify anyone as the individuals with whom she had interacted;

   b.  never asked Mr. Johnson, Mr. Stuckey or Mr. McCallum what type of gun

       was used;

   c.  did not display either Mr. Stuckey or Mr. McCallum or Heyward or

       Munford  in a lineup for Gregory Prasad, John Egan (the boys who

       witnessed the kidnapping), or Kathy Hank, even though all were

       available to participate in such an identification;

   d.  did not attempt to find and interview Aunt Lottie or Jaime (i) to confirm

       Johnson's story about the chain of custody of the gun, (ii) to try to locate

       the firearm, or (iii) determine whether Mr. Johnson was talking about real

people or figments of his imagination;

e.   relied on Heyward and Johnson's self-serving statements linking Mr.
     Stuckey to the gun even though (i) the gun was never found, and (ii) both
     individuals had a tremendous motivation to lie, and thus, were both
     obviously unreliable witnesses;

f.   did not create a DD-5 of any of the four interviews with Munford, and
     never told prosecutors or defense counsel about these interviews, and the
     fact that Munford was at the crime scene when Mr. Blenner's body was
     discovered, all of which were exculpatory of Mr. McCallum and Mr.
     Stuckey;

g.   did not question the fact that ( i) the gun was never found; (ii) Mr. Stuckey
     and Mr. McCallum's fingerprints were not on Mr. Blenner's car or the
     kerosene can used to burn the car; and( iii) neither was able to drive a car,
     and thus, would have been unable to drive Mr. Blenner's car around for
     several hours in unknown parts of the New York City, get gas in East
     Flatbush with a credit card (where the credit card showed the
     perpetrators obtained gas) and then eventually abandon the car some
     time later in Brooklyn.

108.  The Named Defendants knew or should have known that they did not have probable
cause to arrest and prosecute Mr. McCallum and Mr. Stuckey because they deliberately
used constitutionally impermissible practices to manufacture evidence against him that
they knew to be false. They procured the indictment by manufacturing evidence
(coercing Mr. Stuckey and Mr. McCallum into falsely confessing), suppressing evidence

(i.e., failing to create DD-5s of the interview with Ms. Hank in which she looked at mug books, and the four interviews with Munford), and other police misconduct undertaken in bad faith, i.e., the actions or inactions described in, *supra*, ¶ 105 (a), (c), (d), (e), (f) and (h) above. There was no physical evidence linking Mr. McCallum or Mr. Stuckey to any of the crime scenes (the kidnapping, the cite at which the body was found, or the cite at which the car found). The only evidence tying Mr. Stuckey to the crime came from the two unreliable individuals, and the false confessions, both of which the Named Defendants knew or should have known were false. The only evidence tying Mr. McCallum to the crime were the false confessions. Nevertheless, the Named Defendants caused Mr. Stuckey and Mr. McCallum to be indicted for the murder and kidnapping of Nathan Blenner, and the related charges.

109. The Named Defendants procured an indictment against Mr. McCallum and Mr. Stuckey in bad faith and conspired to charge him with falsely committing the murder, kidnapping and related crimes in bad faith.

110. Mr. McCallum and Mr. Stuckey are innocent of the crimes of which they were accused, convicted and sentenced.

**The overturning of the conviction**

111. Plaintiff's case caught the attention of Rubin "Hurricane" Carter, who founded Innocence International in Toronto Canada, following his own highly-publicized exoneration in 1985. In 2004, Carter and Ken Klonsky, the Assistant Director at Innocence International, assembled a legal team to look at Plaintiff's case and attempt to exonerate him.

112.  Over the course of the past ten-plus years, the team found and interviewed witnesses; had the  DA's office test physical evidence for DNA; and established holes in the trial evidence as described above.

113  Ultimately, a thorough and new re-investigation of the case was done by recently-elected KCDA Kenneth R. Thompson.

114  The KCDA's Conviction Review Unit agreed that the conviction was wrongful and unjust and that it should be vacated and the indictment dismissed.

115..  In consenting to the Plaintiff's motion, Assistant District Attorney Mark Hale, stated that the re-investigation of the case revealed that:

 (a) a material witness (James Johnson) who supplied the probable cause to the police that resulted in the arrest of Plaintiff gave false and misleading statements to the police and false and misleading testimony in court at the trial. (See Ex. A at page 4 line 4). Furthermore, ADA Hale stated that the police at that time should have been able to determine that Mr. Johnson's statements were false and misleading.

b) There is no evidence whatsoever that connects Plaintiff to the crime that was committed or the three different crime locations (See Ex. A at page 4 lines 18-25);

c) There is quite a bit of evidence that would tend to connect people other than the Plaintiff to the crime scenes (See Ex. A at page 5 line 4); and

d) The confession of Plaintiff was very brief and undetailed; internally contradictory to Mr. Stuckey's confession; unmistakable and irrefutable evidence that the statement were not voluntary recollections or admissions of the two defendants but rather were the product of improper suggestion, improper inducement and perhaps coercion (See Ex. A at page 5 lines 7-16);

116. The KCDA then joined in the motion to vacate the conviction. The KCDA then moved to also dismiss the indictment.

117. The conviction was vacated and the indictment dismissed. (See Ex. B)

118.  The new evidence in this case further reveals that the Plaintiff was convicted upon false evidence and a false, coerced confession. The new evidence reveals that members of the New York City Police Department and/or the KCDA's office then under the direction of Elizabeth Holtzman, withheld exculpatory evidence and tried to confuse and obfuscate the Court and the jury. The evidence establishes that the arrest; imprisonment; prosecution; and conviction of the Plaintiff were unjust; wrongful; unconstitutional, and in violation of Plaintiff's civil rights.

**The City's Deliberate Due Process Violations**

119. In the years surrounding Plaintiff''s false arrest, malicious prosecution and wrongful conviction, officers of the NYPD routinely engaged in misconduct, including, but not limited to: (a) falsification or manufacturing of evidence, including but not limited to coercing confessions, and coercing witnesses into falsely inculpating defendants, and manufacturing confessions; and (b) failing to turn over exculpatory evidence/*Brady* material to prosecutors and/or defendants.

120  In the years surrounding Plaintiff's false arrest, malicious prosecution and wrongful conviction, members of the KCDA's office routinely engaged in misconduct, including, but not limited to failing to turn over exculpatory evidence/*Brady* material.  These are precisely the types of misconduct that sent Plaintiff to prison for approximately 29 years for a crime he did not commit.

121.  In the 1980s and early 1990s falsification or manufacturing of evidence was a regular practice of the NYPD,  and failure to timely disclose exculpatory evidence/ *Brady* material, were regular practices in both the NYPD and the KCDA's office. The practices were so widespread and persistent that they constituted the custom and *de facto* policies of the two organizations. At the time of Plaintiff's arrest, policymaking officials at both the NYPD and the KCDA'S office acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of officers and prosecutors not to falsify evidence, and to disclose exculpatory evidence/*Brady* material.

122.  Supervisory personnel in both offices were aware of this widespread and persistent misconduct, but took no adequate corrective or preventive measures. NYPD officers, line prosecutors in the KCDA's office, and their respective supervisors were deliberately indifferent to the abuses inflicted on individuals suspected of or charged with criminal activity, whose convictions were regularly secured without regard to their constitutional rights or their guilt. Officers and prosecutors were left to operate with the assumption that they could engage in these abuses without risking appropriate disciplinary consequences.

123. The consequences for criminal defendants and society were enormous. Throughout this period, one false conviction after another was secured, and dozens of innocent men and women, if not more, were sent to prison from Kings County alone. In 2009 the *Final Report of the New York State Bar Association's Task Force on Wrongful Convictions* concluded that government errors like the ones committed in McCallum and Stuckey's cases caused well over half of the wrongful conviction cases.

124.  Published judicial opinions and other public records alone show that in the 1980s and early 1990s, dozens of criminal defendants were convicted in Kings County alone by means of similarly unconstitutional tactics by police officers and prosecutors and subsequently had their convictions vacated or were acquitted on retrial. These individuals include, but are by no means limited to, Jeffrey Blake, Lamont Branch, Calvin Boyette, Erick Jackson-Knight, Alvena Jennette, Darryl Austin, Robert Hill, Sami Leka, William Lopez, Todd Lumpkins, John Malfredi, Harry McFarlane, Ronald Pondexter, Kieth Roberts, Antonio Vilardi, Derrick Deacon, Shariff Wilson, Antonio Yarbough, Colin Warne, Anthony Faison, Cy Greene, Barry Gibbs, Jonathan Fleming, Derrick Hamilton, David Ranta, Charles Shepherd and Shabaka Shakur.

**The NYPD's Policy or Practice of Falsifying/Manufacturing Evidence**

125.  Detective Butta's coercion of Stuckey and McCallum into falsely confessing to crimes they did not commit, including,  telling Stuckey and McCallum the statements to make in their videotaped confession, was a form of falsification/manufacturing of evidence.

126. Similar to Detective Butta's conduct towards Mr. Stuckey and Mr. McCallum, NYPD detectives in the 1980s and early 1990s engaged in a widespread and persistent pattern and practice of coercing others into confessing to crimes they did not commit, and for which they were subsequently exonerated.  These individuals included:

      a.   Shariff Wilson (crime in 1992; convicted in 1994; conviction vacated and indictment dismissed in 2014; District Attorney's office joined in the motion to vacate): Brooklyn detectives engaged in coercive, threatening tactics to obtain 15 year old Sharriff Wilson's false confession to multiple

murders. These unlawful tactics were similar to those used on Mr.

Stuckey and McCallum. Just as in the Stuckey/McCallum confessions, the

detectives verbally threatened Wilson, physically assaulted and battered

him, and told him that if he told them what they wanted him to say he

could go home. Also similar to Mr. Stuckey and McCallum's cases, the

detectives provided Wilson with non-public facts about the murders, and

coached him to provide these details when he later made the videotaped

confession.

b.  Antonio Yarbough (crime in 1992; convicted in 1994; conviction vacated

and indictment dismissed in 2014; District Attorney's office joined in the

motion to vacate): In 1992, Brooklyn detectives engaged in coercive,

threatening tactics to obtain 18 year old Antonio Yarbough's (Wilson's

co-defendant) false confession to multiple murders. The unlawful tactics

used in Yarbough's case were similar to those used on Mr. Stuckey and

McCallum. One of the detectives physically assaulted Yarbough, striking

him multiple times on the head and face. Detectives also threatened him;

for example, one of the detectives threatened that he would "blow your

brains out if you don't make a statement." Another detective told him that

if he just signed a confession, the interrogation would end and he could

later tell the judge that the signature on the confession did not match the

handwriting, and that the judge would believe him. The detectives also

provided Yarbough with non-public facts about the murders. Yarbough

succumbed to the detectives' threats and intimidation and signed the

statement confessing to the crimes that the detectives had written out for him.

    c.   <u>The Central Park Jogger case (Kevin Richardson, Raymond Santana, Jr.,</u> <u>Antron McCray, Kharey Wise and Yusef Salaam) (crime in 1989,</u> <u>convictions in 1990, convictions vacated and indictment dismissed in</u> <u>2002; District Attorney's office joined in the motion to vacate)</u>:  In 1989, these five teenagers, ages 14 to 16 at the time of arrest and interrogation, were wrongly arrested for the brutal attack and rape of a female jogger in Central Park.  All made false, videotaped confessions.  As with Mr. Stuckey and Mr. McCallum, the police used physical assaults and intimidation to compel confessions from three of the defendants in the Central Park Jogger case. In the course of interrogation police assaulted Wise, physically threatened Santana, and enlisted McCray's father to physically intimidate him. Also by way of intimidation, the police yelled or screamed at Salaam, Santana, McCray and Wise. Further, the police falsely promised Richardson, McCray, Wise, and Salaam that they could go home if they confessed and fed them information about the crime, as had been done with Stuckey and McCallum. In addition, Richardson, Santana, and Salaam were kept awake and deprived of sleep and Wise was held overnight at the precinct.

127.  Published court decisions from the late 1970s and early 1980s further demonstrate the NYPD detectives' pattern and practice of coercing individuals into confessing to crimes.  For example:

a. *People v. Brown*, 63 A.D.2d 584, 404 N.Y.S.2d 617 (1st Dep't 1978)

(reversing 1975 conviction and vacating plea upon finding that, in totality of

circumstances, confession was not voluntary, where, *inter alia*, during

interrogation detective told defendant that he felt like putting defendant's head

through a wall); and

b. *People v. Johnson*, 112 Misc.2d 590, 447 N.Y.S.2d 341 (Sup. Ct. NY Cty.

1981) (suppressing confession and finding that confession was involuntary

where police interrogation conduct included, *inter alia,* threats of

prolonged jail time and promises of leniency as well as deprivation of food

during lengthy and intensive interrogation).

128.   Detective Butta not only coerced Mr. Stuckey and Mr. McCallum into falsely

confessing, but also falsified/manufactured evidence by coercing both of these 16 year

old boys into stating that the other had pulled the trigger.  By so doing, Detective Butta

coerced Mr. Stuckey and Mr. McCallum into inculpating another innocent person.  In

Brooklyn alone, in 1980 through 1992, at least ten individuals who were later exonerated

or acquitted on retrial, had been convicted at least in part because Brooklyn police

officers falsified/manufactured evidence by coercing and pressuring witnesses to

inculpate defendants and threatened those witnesses who were reluctant, often with jail

time or physical violence:

a.  Colin Warner (crime in 1980; convicted in 1982; conviction vacated, and

upon information and belief, the indictment dismissed in 2001; District

Attorney's office did not oppose the motion to vacate): witness provided

an affidavit saying that he only identified Warner as the killer because he

was pressured by police;

b.   Cy Greene (crime in 1983; convicted in 1985; conviction vacated in 2006,

and indictment dismissed in 2007):  police coerced a witness to make the

false statement that Greene was at the scene and stabbed victim; police

also  tampered with line-up identification by showing a different  witness

the defendant in a holding cell prior to the line-up;


c.   Barry Gibbs (crime in 1986; convicted in 1988; conviction vacated, and

upon information and belief, indictment dismissed in 2005; District

Attorney's office joined in the motion to vacate): the State's only

eyewitness at the criminal trial, who had testified that he had seen Mr.

Gibbs disposing of the victim's body, revealed that he lied and had never

believed that Mr. Gibbs was the murderer, but had identified Mr. Gibbs

and testified against him only under coercion and intimidation by NYPD

detectives, one of whom had threatened his family if he did not identify

Gibbs in the lineup and again in court;

d.   Derrick Deacon (crime in 1989, convicted in 1989 acquitted on retrial in

2013): though a witness had repeatedly told police officers and

prosecutors that she had seen a different man fleeing the scene of the

crime; officers continually harassed her, encouraged her to identify

Deacon as the killer;

e.  Jonathan Fleming (crime in 1989, convicted in 1990, conviction vacated and indictment dismissed in 2014; District Attorney's office joined in the motion to vacate): witness, who was seven months pregnant coerced into identifying Fleming as the shooter; she was told that if she did not state Fleming was the shooter she would have her baby in jail;

f.  Sami Leka (crime 1988; convicted in 1988; 2nd Cir vacated in 2001; 2002 indictment dismissed): police had pressured the two eye witnesses into identifying Leka by telling them the police were sure he was the man and that he already had a criminal record;

g.  Derrick Hamilton (crime in 1991; convicted in 1992; conviction vacated and indictment dismissed 2015; District Attorney's office joined in the motion to vacate): sole witness identifying Hamilton as the shooter only did so because the detective threatened to charge her with the crime if she did not identify Hamilton.  When this witness recanted she was again threatened by the detective with imprisonment and that her loss of her children;

h.  William Lopez (crime 1989; convicted in 1990; conviction vacated and indictment dismissed in 2013; District Attorney's office joined in the motion to vacate): police coerced four witnesses into giving false statements and identifying Lopez as the shooter or as possessing a shotgun, threatening each of them with incarceration, and one of the them, additionally, with deportation;

i.   David Ranta (crime in 1990; convicted in 1991; conviction vacated and indictment dismissed 2013; District Attorney's office joined in the motion to vacate): one of the witnesses who identified Ranta in the lineup said the lead police detective told him to pick "the guy with the big nose," so he picked Ranta because he had the biggest nose. This witness has affirmed under oath that he did not recognize Mr. Ranta; another witness has admitted to the KCDA's  Conviction Integrity Unit that evidence pointing to Ranta as the shooter was a complete fabrication and that Ranta was framed by  the detective ;

j.   Ronald Pondexter (crime in 1992; convicted in 1993; acquitted on retrial in 1997): witness said that the detective had shown her Pondexter's photograph and persuaded her that he was the gunman and coerced her to identify Pondexter.

129.   In other cases, all in Brooklyn—including Lamont Branch, Alvena Jannette, David Ranta, Jonathan Fleming, Antonio Yarbough, and Sharif Wilson—police falsified/manufactured evidence by offering witnesses rewards and bribes for testimony inculpating the defendants.

130.   In other cases detectives in Brooklyn in the late 1980s and early 1990s falsified/manufactured evidence by manufacturing confessions:

a. Shabaka Shakur (crime in 1988; convicted 1989; conviction vacated in 2015): the detective manufactured a statement implicating Mr. Shakur in the murders, that Mr. Shakur claims he never made, and did not sign; indeed in vacating the confession the judge reasoned that the

44

*AMENDED COMPLAINT OF DAVID MCCALLUM*

detective did not have notes for the type of written statement, did not show or read the statement to Mr. Shakur, and did not ask him to read it

b.David Ranta (crime in 1990; convicted in 1991; conviction vacated and indictment dismissed 2013; District Attorney's office joined in the motion to vacate): the detective fraudulently obtained a purported confession from Ranta by telling him he "needed to sign a manila folder in order to be able to make a phone call." Unbeknownst to Ranta, the detective had written a statement inside the folder, where Ranta purportedly confesses to acting as the lookout for the anticipated robbery.

131.  On July 7, 1994,  the *Report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department* (the "Mollen Report") confirmed that the falsification/manufacturing of evidence in the NYPD throughout the 1980s and 1990s was so widespread, that supervisors knew or should have known about the falsifications, that supervisors' were not held accountable for their rsupervisees' misconduct, and that no attempt was made within the NYPD to eliminate this widespread and persistent practice of falsifications.

132.  According to the Mollen Report, "falsification is widely tolerated by corrupt and honest officers alike, as well as their supervisors. …[O]fficers told [the Commission] that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them."

133.  The Mollen Report concluded, police falsification was "probably the most common form of police corruption facing the criminal justice system," founded in "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world" and a "persistent belief among many officers" that obscuring truth in order to obtain convictions "is necessary and justified, even if it is unlawful."

134.  The Mollen Report further stated:

> When officers genuinely believe that nothing is wrong with fabricating the basis of an arrest, a search or other police action and that civil rights are merely an obstacle to aggressive law enforcement, the Department's top commanders must share the blame. Indeed, we found that for years the Department was content to address allegations of perjury on a case-by-case basis, rather than pursuing the potential for a broader based investigation. For example, supervisors were rarely, if ever, held accountable for the falsifications of their subordinates. [The Commission is] not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch . . . There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including Police Commissioners and Internal Affairs Chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.  (emphasis added)

135.  In addition, the Mollen Report found that police falsification was so widespread and persistent that prosecutors even "acknowledged – off the record – that perjury and falsifications are serious problems in law enforcement that, though not condoned, are ignored."

136.  A second report, *Report of the Office of the Comptroller on Police Department Monitoring of Lawsuits and Claims of Police Misconduct,* issued in 1992 under Comptroller Elizabeth Holtzman ("Holtzman Report"), presented additional evidence of

the widespread and persistent policy or custom of unconstitutional NYPD misconduct

during the time period Plaintiff was arrested, and the fact that the City did not take

adequate corrective or preventive measures. The Holtzman Report examined police

misconduct claims brought against the City from fiscal year 1987 through fiscal year

1991.

137.  According to the Holtzman Report, during the 1980s, the NYPD did not have a

policy in place to identify and reprimand NYPD members who had engaged in

misconduct. It found that "until recently [the report was issued in 1992] the NYPD had

no system for automatic monitoring of police officers who had been the subject of

civilian complaints."  During the relevant period

> the NYPD tolerated a significant number of complaints before taking
> corrective action. In the department's own words it would take an
> 'inordinate' number of complaints before an officer was targeted for
> training.

138.  The Holtzman Report also stated that the NYPD "relied upon individual Law

Department attorneys … to notify it if NYPD policies or procedures are called into

question by the facts of a particular case. But there is no policy in the Law Department

requiring individual attorneys routinely to review cases and advise the NYPD if there are

such problems that need correcting."

139.  The examples of police falsification/manufacturing of evidence cited in the

preceding series of paragraphs are likely just the tip of the iceberg. According to news

reports and court cases, it has been revealed that Brooklyn Detective Louis Scarcella

participated in fabricating/manufacturing evidence, including obtaining false confessions,

procuring false witnesses, coaching and/or suborning perjury from witnesses, and

withholding exculpatory evidence.  Indeed the KCDA is currently investigating 50- 70

convictions that relied on Scarcella's work. Seven of the exonerations discussed in the preceding paragraphs were cases on which Detective Louis Scarcella had worked.  In vacating a conviction based on witness identification testimony that Scarcella procured, a court emphasized Scarcella's "malfeasance in fabricating false" evidence. *See People v. Hargrove*, 49 Misc. 3d 1208(A) (N.Y. Sup. Ct. 2015).

140.   According to testimony taken at a court hearing, Scarcella stated on the *Dr. Phil* show in 2007 show that "there were no rules when it came to prosecuting homicide cases and that he did not play by the rules (6/24/14 Transcript. P. 81)."  *See People v. Hargrove*, 49 Misc. 3d 1208(A) (N.Y. Sup. Ct. 2015).  The court noted that "This statement indicates an acknowledgment of a lack of disregard for rules."  *Id.*

141.  Given the long duration of Scarcella's misconduct (he was on the police force from 1973 to 1990) coupled with Scarcella's high profile statements, supervisory personnel on the NYPD must have been aware of the misconduct, but failed to take adequate corrective or preventive  measures. It would be naïve and misguided to think or believe that the reprehensible and pervasive conduct of Detective Scarcella was limited to himself when Detecitve Scarcella's own words and the evidence clearly indicate that it was a widespread problem throughout the City and especially in Kings County.

142.  NYPD supervisors and policymakers were provided notice of the need to properly instruct, train, supervise, and/or discipline employees with regard to their constitutional obligations not to falsify/manufacture evidence by the judicial decisions, wrongful convictions, examples that that the Mollen Report and Holzman Report relied upon, and the widespread practice of abuse in the NYPD.  Such examples should put the NYPD on notice and/or should have put the NYPD on notice that the City could be held liable for

its failure to adequately train police officers and investigators regarding their obligation not to falsify/manufacture evidence.

143.  The NYPD nonetheless failed to properly instruct, train, supervise, and/or discipline employees regarding issues related to falsification/manufacturing of evidence, despite knowing to a moral certainty, in light of these cases, reports, and circumstances, that such issues regularly arise in the investigation and prosecution of criminal cases; that such issues present police employees with difficult choices of the sort that instruction, training, supervision, and/or discipline will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees falsifying/manufacturing evidence and by the incentives that police employees have to make the wrong choice in such situations; and that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of individuals suspected of or charged with a crime and cause them constitutional injury.

144.  NYPD supervisors were deliberately indifferent to the rampant misconduct, including the falsification/manufacturing of evidence similar to the practices used in Stuckey's arrest and prosecution as well as the other arrests and prosecutions described above.

145. Throughout the 1980s and early 1990s, NYPD supervisors and policymakers were aware of a serious risk of constitutional violations caused by the NYPD members falsification/manufacturing of evidence, and that the failure to take any action in response to this problem—whether through training or discipline—was the result of deliberate

indifference to the constitutional rights of all individuals suspected or charged with crimes, including Plaintiff.

**The NYPD's Policy and Practice of Failing to Disclose Exculpatory Material**

146.  In Plaintiff's case the Named Defendants, suppressed exculpatory evidence and, upon information and belief, did not turn this information over to the District Attorney. For example, they failed to create DD-5s of the interview with Ms. Hank in which she looked at mug books, and did not identify Stuckey or McCallum, and did not create Dd-5s of the four interviews with Munford.

147.  In the years surrounding Plaintiff's arrest prosecution, members of the NYPD regularly withheld exculpatory information.

148. In Brooklyn alone, in 1983 through 1992, at least eight individuals who have been exonerated or acquitted on retrial were convicted, at least in part, because Brooklyn police officers failed to disclose exculpatory material have been:

        i.    <u>Cy Greene (crime in 1983; convicted in 1985; conviction vacated in 2006, and indictment dismissed in 2007):</u> police omitted exculpatory information from DD5s (specifically that alternative suspects who bore no rebalance to Cy Greene were near the scene of the crime around the time of the crime), and failed to create a report of a suspect escaping from custody, and  omitted any reference to at least one material witness from police reports who would have been a source of information for identifying the suspects;

ii. <u>Alvena Jennette, & Darryl Austin (crime in 1985; convicted in</u>
<u>1988; conviction vacated and indictment dismissed in  2014;</u>
<u>District Attorney's office joined in the motion to vacate):</u>
Documents that indicated an alternative shooter were in the police
file, but they were not made part of a DD5, were not made
available to the prosecution, and were not, turned over to the
Defense at the time of trial;

iii. <u>Todd Lumpkins (crime 1986; convicted 1987; acquitted on</u>
<u>retrial1989):</u> Judge ruled that the detective had failed to turn over
key information to prosecutors – a witness  had described suspects
who did not resemble Lumpkins and did resemble a description of
a suspect given by a defense witness

iv. <u>Jonathan Fleming (crime 1989, convicted in 1990, conviction</u>
<u>vacated and indictment dismissed in 2014; District Attorney's</u>
<u>office joined in the motion to vacate):</u>  two police members had a
letter from the Orlando Police Department verifying that Fleming
was in Orlando, and thus, could not have committed the murder,
but did not disclose this exculpatory information; additionally
police and prosecutors withheld the existence of a time-stamped
receipt from an Orlando hotel further proving Fleming was in
Orlando;

v.  Derrick Deacon (crime 1989, convicted in 1989, acquitted on
retrial in 2013): a witness had initially told police officers that she
saw a different man fleeing the scene of the crime, but was
subsequently coerced into identifying Deacon; these initial
exculpatory statements were not documented in DD-5s or
anywhere else in the police file, and, upon information and belief
the police did not disclose this negative identification to the district
attorneys who tried Deacon's case;

vi.  David Ranta (crime 1990, convicted in 1991, conviction vacated
and indictment dismissed 2013; District Attorney's office joined in
the motion to vacate): as the KCDA's office noted in an
affirmation supporting Ranta's Vacatur of Conviction Detectives,
Scarcella's and his partner concealed exculpatory evidence
pointing to Joseph Astin rather than Ranta as the shooter, by, *inter
alia*, failing to document in DD5s or any police reports or notes
meetings with witnesses, interviews, or investigations of other
possible defendants, and failing to document that they spoke with
Joseph Austin's widow regarding the investigation into the murder.

vii.  Derrick Hamilton: (crime in 1991; convicted in 1992; conviction
vacated and indictment dismissed 2015; District Attorney's office
joined in the motion to vacate): a witness who had subsequently
identified Hamilton as the shooter initially stated that she did not
witness the crime, and, upon information and belief, police failed

52

to turn over to prosecution documentation of the witness's initial exculpatory statement.

149. NYPD officers' failure to disclose exculpatory material was not confined to Brooklyn alone.  For example, in Queens, when Charles Daniels was investigated for a 1979 crime and convicted , upon information and belief, detectives withheld evidence from defense and prosecution lawyers that the sole witness, who was a 10 year old boy, was under treatment as emotionally disturbed, was an unreliable, and had identified someone else before Daniels.  Mr. Daniels was convicted 1979, the conviction was reversed by an appellate court in 1982, and the indictment was dismissed in, upon information and belief, 1983.

150.  Numerous additional credible allegations were made in the years leading up to Plaintiff's arrest, many substantiated by judicial decisions, that police officers had failed to disclose exculpatory information and wrongfully withheld, lost, or destroyed evidence favorable to the defense that they had been required to timely disclose to the prosecution or the defense under *Brady*.  For example, the following published court decisions related to crimes committed in 1970s and 1980s particularly demonstrates NYPD's widespread and persistent policy and practice of withholding exculpatory information, and should have put supervisors on notice of this pattern and practice:

> i. *Walker v. City of New York*, 974 F.2d 293, 294 (2d Cir. 1992) ("In 1971 police officers and prosecutors [in Brooklyn] covered up exculpatory evidence and committed perjury in order to insure Walker's conviction despite their knowledge of Walker's probable innocence.");

ii. *Carter v. Harrison*, 612 F.Supp. 749 (E.D.N.Y. 1985) (denying the

New York City's summary judgement on the plaintiff's *Monell* claim

where the plaintiff was arrested for a 1981 crime, and alleged that, (i)

in his case, the police had failed to turn over exculpatory evidence to

the District Attorney or to the defense, (ii)  there were four specific

prior instances of police suppression of exculpatory evidence, and (iii)

that New York city had "failed to adopt an appropriate policy or

provide sufficient training with regard to the preservation and

production of exculpatory evidence by individual members of the

police force" );

iii. *People v. Saddy*, 84 A.D.2d 175, 445 N.Y.S.2d 601 (2d Dep't

1981) (reversing convictions where police violated *Brady* by erasing

recorded conversations between law enforcement officer and

defendant);

iv.  *People v. Springer*, 122 A.D.2d 87, 504 N.Y.S.2d 232 (2d Dep't

1986) (police's destruction of surveillance photographs was a *Brady*

violation);

v. *People v. Lumpkins*, 141 Misc. 2d 581, 533 N.Y.S.2d 792 (Sup. Ct.

Kings Cty. 1988) (vacating conviction where detective withheld *Brady*

material from prosecution);

vi. *People v. Cortez*, 149 Misc. 2d 886, 898, 564 N.Y.S.2d 963 (Crim.

Ct. Kings Co. 1990) (indictment dismissed where police erased

subpoenaed recording of radio communication, acting "contrary to. . . [the] spirit" of *Brady*.).

151.  NYPD supervisors and policymakers were provided notice of the need to properly instruct, train, supervise, and/or discipline employees with regard to their constitutional obligations by these judicial decisions— in particular *Carter v. Harrison*  and *Walker v. City of New York*—which directly criticized the NYPD for failing to train or supervise their officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies. Such cases put the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their *Brady* obligations.

152. NYPD supervisors and policymakers were further provided notice by numerous decisions of the United States Supreme Court, the United States Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule,  the inherent obviousness of the need to train, supervise, and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain convictions and the powerful incentives they have to ignore, discard, fail to record, fail to disclose, destroy, and suppress, evidence favorable to a criminal suspect or defendant.

153.  The NYPD nonetheless failed to properly instruct, train, supervise, and/or discipline employees regarding *Brady* issues, despite knowing to a moral certainty, in light of these cases, reports, and circumstances, that such issues regularly arise in the investigation and prosecution of criminal cases; that such issues present police employees with difficult choices of the sort that instruction, training, supervision, and/or discipline will make less

difficult, or that the need for further instruction, training, supervision, and/or discipline

was demonstrated by a history of police employees mishandling such situations and by

the incentives that police employees have to make the wrong choice in such situations;

and that the wrong choice by such employees concerning such issues will frequently

cause the deprivation of the constitutional rights of criminal suspects or defendants and

cause them constitutional injury.

**The KCDA's Policy and Practice of Failing to turn over Brady**

**Material/Exculpatory Evidence**

154. In violation of their constitutional duties, prosecutors from the KCDA's Office

failed to turn over *Brady* material to defendants in many of the cases identified in the

preceding paragraphs and, upon information and belief, in countless other cases.

155.  For example, After Larry Gurley's 1972 conviction, a 1991 Freedom of Information

Law request uncovered an exculpatory ballistics report from the NYPD—which

supported Gurley's account that he acted in self-defense –that prosecutors had never

provided to the defense Mr. Gurley's conviction was vacated in 1992 and the  indictment

was dismissed in 1994.

156.  Prosecutors in Eric Jackson's 1980 prosecution withheld reports in an arson case

that their expert had determined the fire to be an accident and that evidence of arson had

been fabricated. Mr. Jackson's conviction was vacated in 1988, and he was acquitted on

retrial in 1994.

157.  Prosecutors in Scott Fappiano's 1983 case withheld evidence that the victim, who testified against the defendant at trial, had previously failed to identify him as the perpetrator. Mr. Fappiano's conviction was vacated and the indictment was dismissed in 2006.

158.  After Floyd Batten's 1984 conviction, a Freedom of Information Law request uncovered exculpatory police reports that were never turned over to the defense.  Mr. Batten's conviction was vacated in 2003, and the indictment was dismissed in 2014.

143.  In 1984, prosecutors concealed reports in Calvin Boyette's case reflecting witness reports that someone other than Boyette had committed the offense and that Boyette did not match the victim's initial description of her attacker. Mr. Boyette's conviction was vacated  and the indictment was dismissed in in 2001.

159.  Similarly, in Cy Greene's case, in 1985, prosecutors along with police officers suppressed witness descriptions that did not match the defendant and evidence that a key witness had initially named a man other than defendant as the perpetrator. Mr. Greene's conviction was vacated in 2006, and the indictment was dismissed in 2007.

160.  In Sami Leka's case in 1990, prosecutors worked with police officers to keep from the defendant the identity of eyewitnesses who would have contradicted the accounts of witnesses who testified against him at trial. Mr. Leka's conviction was vacated in 2001, and the indictment was dismissed in 2002.

161.  And at William Lopez's 1990 trial, prosecutors elicited false testimony that a witness had received no inducement to testify against the defendant. Mr. Lopez's conviction was vacated and the indictment was dismissed in 2013.

162.  The prosecutors who tried John Manfredi in 1989 withheld evidence that a key witness had previously declared the defendant not to have committed any crime. Mr. Manfredi's conviction was vacated and the indictment was dismissed in 1994.

163. The Mollen Report confirmed that prosecutors in New York City throughout the 1980s and 1990s knew about and routinely ignored the use of perjured testimony in their prosecutions.  Given the customs, practices, and policies of prosecutors in the Brooklyn DA's office—including suppression of exculpatory evidence and elicitation of false testimony—DA supervisors were well aware of their staff's misconduct.

164.  Moreover, multiple judicial decisions had been issued overturning convictions based on the KCDA's failures to turn over exculpatory evidence. *See, e.g. New York v. Cardona*, 526 N.Y.S.2d 203, 204 (2d Dep't 1988) ("the prosecution violated the defendant's statutory right to be provided with prior written or recorded statements made by prosecution witnesses," including "descriptions of the perpetrators, neither of which was consistent with the defendant's appearance"); *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (noting that defendant's conviction was vacated in 1990 for prosecutorial failure to disclose, *inter alia*, victim's identification of another individual as perpetrator); *New York v. Gurley*, 602 N.Y.S.2d 184 (2d Dep't 1993) (affirming vacatur of defendant's conviction where ballistics report contradicting prosecution's theory withheld); *New York v. Jackson*, 154 Misc. 2d 718 (N.Y. Sup. 1992) (confirming prior, 1988 finding that prosecutor had suppressed evidence of defendant's guilt and destroyed notes favorable to defendant and concluding that "society was the loser in this trial"); *New York v. Vilardi*, 542 N.Y.S.2d 238 (1989) (vacating arson conviction because

prosecution violated defendant's rights under *Brady* by withholding bomb squad expert report stating that no explosion had occurred), *aff'd* 76 N.Y.2d 67 (1990).

165.   In the years surrounding Plaintiff's prosecution, prosecutors from the KCDA's Office also regularly failed to turn over *Rosario* material to defendants, in violation of their constitutional duties.  For example, prosecutors committed *Rosario* violations in the following cases:

> a. *People v. Perez*, 65 N.Y.2d 154 (1985) (finding that the prosecution committed a  *Rosario* violation by withholding from defense counsel statements made by a prosecution witness to members of the defendant's family that were directly related to the witness's trial testimony);

> b. *People v. Ranghelle*, 69 N.Y.2d 56 (1986) (superseded by statute) (reversing conviction and ordering a  new trial where the prosecution failed to produce *Rosario* material before evidence was closed at trial);

> c. *People v. Cardona*, 526 N.Y.S.2d 203, 204 (2d Dep't 1988) (granting defendant's motion to vacate conviction and ordering a new trial upon finding that the prosecution committed a *Rosario* violation by failing to turn over the signed statement of the People's key witness, which included descriptions of the perpetrators that were not consistent with the defendant's appearance);

> d.  *People v. McFarlane*, 533 N.Y.S.2d 479 (2d Dep't 1988)  (1987 conviction reversed and new trial ordered where the prosecution committed a *Rosario* violation by failing to timely provide defense with a witness's prior sworn statement);

e.  *People v. Jackson*, 142 Misc. 2d 853, 538 N.Y.S.2d 677 (Sup. Ct. Kings

Co. Crim. Term 1988) – vacating Jackson's 1980 conviction where the

prosecution violated the *Rosario* rule by failing to turn over to defense a

memo containing a synopsis of a prosecution witness's prior statements);

f.  *People v. Lugo*, 153 A.D.2d 761, 544 N.Y.S.2d 985 (2d Dep't 1989)

(granting defendant's motion to vacate his 1981 conviction where the

prosecution violated the *Rosario* rule);

g.  *People v. Cortez*, 149 Misc. 2d 886, 898, 564 N.Y.S.2d 963 (Crim. Ct.

Kings Co. 1990) (criminal complaint dismissed where the prosecution

violated its affirmative obligation to preserve from erasure a police tape that

constituted *Rosario* material).

166. Supervisors at the DA made no attempt to discipline the attorneys involved in these

cases or any of the myriad others in which defendants' constitutional rights were violated

by the failure to turn over exculpatory evidence and the use of testimony that prosecutors

knew, but did not disclose, to be questionable at best.

167.  In addition, policymaking officials in the KCDA's office failed to instruct, train,

and/or supervise employees with respect to their constitutional obligations, despite

knowing to a moral certainty that similar concerns about *Brady* and reliable testimony

arise in the investigation and prosecution of criminal cases, that such issues present

prosecutors with difficult choices of the sort that instruction, training, supervision and/or

discipline will make less difficult, or that the need for further instruction, training,

supervision, and/or discipline was demonstrated by a history of prosecutors mishandling

such situations and by the incentives that prosecutors have to make the wrong choice in

such situations; and that the wrong choice will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury. Supervisors were on notice that the failure to train and discipline prosecutors was causing violations of citizens' rights, and yet they remained deliberately indifferent to these violations, failing to provide the necessary training and correction. Prosecutors learned that they could employ unconstitutional, illegal and unjust tactics to secure convictions at the expense of defendants' due process rights without consequence to themselves.

## PLAINTIFF'S DAMAGES AND INJURIES

168   Plaintiff's injuries and damages include, but are not limited to:

a.   His false arrest and malicious prosecution and unjust conviction for attempted murder, burglary, robbery, assault, and criminal possession of a weapon;

b.   His loss of liberty for a total of nearly twenty-nine (29) years, including the months before his conviction and the balance of time after that event;

c.   Past and future physical illnesses and injuries as a result of her wrongful conviction and his experiences in prison;

d.   Past and future mental and emotional injuries, pain and suffering

e.   The loss of employment income, and diminution of future earning ability.

f.   Loss of enjoyment of life;

g.   violation of his civil rights;

h.   shame and embarrassment;

i.   loss of support of his family and friends;

61

j.   emotional distress, anxiety and fear.

k. Such other damages as yet to be determined

## **FIRST CAUSE OF ACTION**

### **Malicious Prosecution Under 42 U.S.C. §1983**

169.   Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 168 of this Complaint.

170   Defendants, with malice and without probable cause did arrest and aided in the prosecution of Plaintiff while all acting individually and in concert caused Plaintiff to be arrested and prosecuted for the aforementioned crimes, violating Plaintiff's constitutional rights.

171.   Defendants with malice and while acting individually and in concert, intentionally and knowingly misrepresented the truth and withheld exculpatory evidence from the grand jury and the defense..

172.   Defendants with malice, knew or should have known, with deliberate reckless indifference to the truth, that probable cause did not exist to arrest or prosecute Plaintiff due to, but not limited to the fact that Plaintiff's statements allegedly implicating him were not a product of his free will, and that evidence had been fabricated by the Defendants, and that Defendants did not disclose this or any exculpatory or impeachment evidence to the grand jury, trial jury or defense counsel

173.  Defendants arrested and prosecuted Plaintiff without probable cause, in violation of his constitutional rights with conduct no reasonable officer would have believed was lawful.

174.    The Defendant officers performed the above-described acts while acting under the color of state law, deliberately, intentionally and recklessly disregarding the truth and Plaintiff's rights with malice.

175.    Plaintiff is actually innocent of the crimes he was charged with and convicted of.

176. Prosecution was terminated in Plaintiff's favor on October 15, 2014 by dismissal of the indictment with prejudice.

177.  Due to the Defendants' conduct, Plaintiff was maliciously prosecuted, wrongfully convicted and imprisoned for almost twenty-nine years and suffered other grievous and continuing damages and injuries set forth in ¶168 of this complaint.

178.    The individual defendants all acted under color of State law at the time of their actions.

179. The Defendant The City of New York is responsible for the acts and omissions of the individual defendants under the doctrine of respondeat superior.

180.    By reason of the foregoing, Plaintiff was damaged as described in paragraph 168 of this complaint and was otherwise damaged, all to his detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS along with interest, cost and disbursements and such other and further relief as the court deems just and proper.

<u>**SECOND CAUSE OF ACTION**</u>

**Violation of Plaintiff's Due Process Rights under 42 U.S.C. §1983, 14th and 4th Amendments**

181 Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 180 of this Complaint.

182.    Defendants, acting individually and in concert, failed to investigate evidence they knew or should have known, or through deliberate and reckless indifference, was exculpatory for Plaintiff's prosecution.

183.    Plaintiff is actually innocent of the crimes of attempted murder, burglary, robbery, assault and criminal possession of a weapon.

184.    Defendant Officers and Detectives, and their supervisors, failure to properly investigate and failure to investigate available exculpatory evidence deprived Plaintiff of his constitutional rights.

185.    Defendants did this without probable cause, in violation of her constitutional rights with conduct no reasonable officer would have believed was lawful.

186.    The Defendant officers performed the above-described acts while acting under the color of state law, deliberately, intentionally and recklessly disregarding the truth and Plaintiff's rights with malice.

187.    Defendants coerced and induced Plaintiff to falsely confess to the crime.

188.    Defendants proceeded with the arrest and prosecution of the Plaintiff even though they knew that they had no probable cause and insufficient credible and reliable evidence with which to obtain a conviction.

189.    Due to the Defendants' conduct, Plaintiff was maliciously prosecuted, wrongfully convicted and imprisoned for almost twenty-nine (29) years and suffered other grievous and continuing damages and injuries set forth in ¶168 of this complaint.

190.    The individual defendants all acted under color of State law at the time of their actions.

191. The Defendant The City of New York is responsible for the acts and omissions of the individual defendants under the doctrine of respondeat superior.

192.    By reason of the foregoing, Plaintiff was damaged as described in paragraph 168 of this complaint and was otherwise damaged, all to his detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS along with interest, cost and disbursements and such other and further relief as the court deems just and proper.

### THIRD CAUSE OF ACTION

### Claims under 42 U.S.C. §1983 Civil Rights Conspiracy

193.    Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 192 of this Complaint.

194.    Defendant Detectives and Officers, acting within the scope of their employment and under the color of law, agreed amongst themselves and with others to act in concert in order to deprive the Plaintiff of his constitutional rights

195.    Defendants, in furtherance of the conspiracy engaged in conduct, but not limited to, the misrepresentation of false identifications of the Plaintiff and withholding of exculpatory evidence from the grand jury, trial jury, prosecution and defense counsel.

196.    Due to the Defendants' conduct, Plaintiff was falsely arrested, maliciously prosecuted, wrongfully convicted and imprisoned for almost twenty-nine (29) years and suffered other grievous and continuing damages and injuries set forth in ¶168 of this complaint.

197    The individual defendants all acted under color of State law at the time of their actions.

198. The Defendant The City of New York is responsible for the acts and omissions of the individual defendants under the doctrine of respondeat superior.

199.    By reason of the foregoing, Plaintiff was damaged as described in paragraph 168 of this complaint and was otherwise damaged, all to his detriment in the sum of FIFTY MILLION ($50,000,000.00) DOLLARS along with interest, cost and disbursements and such other and further relief as the court deems just and proper.


### FOURTH CAUSE OF ACTION

*Failure to Intercede under 42 U.S.C. §1983*

200.    Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 199 of this Complaint.

201.    Defendants acting toward Plaintiff under color of law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and had a multitude of opportunities to intercede on behalf of the Plaintiff and to prevent the violation of his constitutional rights, but declined or refused to do so. These refusals were a direct violation against Plaintiff's Fifth Amendment Rights against self-incrimination and his Due Process rights.

202.    No reasonable municipality, police department, officer, detective, or supervisor would have believed that these refusals and failures to intercede were lawful.

187.    Due to the Defendants' conduct, Plaintiff was falsely arrested, maliciously prosecuted, wrongfully convicted and imprisoned for almost twenty-nine (29) years and suffered other grievous and continuing damages and injuries set forth in ¶168 of this complaint.

188.    The individual defendants all acted under color of State law at the time of their actions.

189. The Defendant The City of New York is responsible for the acts and omissions of the individual defendants under the doctrine of respondeat superior.

190.   By reason of the foregoing, Plaintiff was damaged as described in paragraph 168 of this complaint and was otherwise damaged, all to his detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS along with interest, cost and disbursements and such other and further relief as the court deems just and proper.

## FIFTH CAUSE OF ACTION

### *Negligent Hiring, Training and Supervision under State law*

### *City of Canton v. Harris and 42 U.S.C. §1983*

191 Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 190 of this Complaint.

192  Defendant City, its employees, agents and  supervisors,  acting toward Plaintiff under color of the law statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of their employment knew or should have known that their subordinate officers had deprived Plaintiff of his constitutional rights through their subordinates gross misconduct that included but not limited to: coercing and causing a false confession, deliberately ignoring exculpatory evidence in violation of *Brady*, failing to properly investigate, and their ongoing affirmative duty to come forward with evidence of innocence and the truth of their illegal misconduct.

193.  Defendant City, its employees, agents and supervisors, by failing to supervise their subordinate officers and by their active participation in the facilitation of this conduct deprived Plaintiff of his constitutional right against self-incrimination and to be free form coercion and duress during the arrest and investigative process. .

194. Defendant City, its employees, agents and supervisors permitted their subordinates to act with license as they wished without proper supervision, discipline or training, and in an environment which their subordinates knew that their violations of Plaintiff's constitutional rights would be facilitated, approved and/or condoned by their supervisors.

195.  Defendant City, its employees, agents and supervisors acted in a way which no reasonable employer or supervisor would believe were lawful.

196. Due to the City's conduct, Plaintiff was falsely arrested, maliciously prosecuted, wrongfully convicted and imprisoned for almost twenty nine  years and suffered other grievous and continuing damages and injuries set forth in paragraph 168 of this complaint.

197. Defendants CITY failed to properly, hire, train and supervise their employees in general and those specifically involved with Plaintiff's case; failed to take proper steps to insure that its employees were aware of citizens' including Plaintiff's Constitutional rights; aware of their obligations under the Constitutions of the United States and the State of New York; failed to properly train and supervise their employees in the handling of exculpatory evidence; failed to properly train and supervise their employees in the taking of confessions; failed to properly train and supervise their employees in the securing and pursuit of evidence; and failed to properly train and supervise their employees in proper and legal police procedure.

68

198   By reason of the foregoing, Plaintiff was damaged as described in paragraph 168  of this complaint and was otherwise damaged, all to her detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS along with interest, cost and disbursements and such other and further relief as the court deems just and proper.

## SIXTH CAUSE OF ACTION

### *Monell* **claim against City of New York** *under 42 U.S.C. §1983*

199   Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 198 of this Complaint.

200. The City of New York directly caused the constitutional violations suffered by Plaintiff, and is liable for the damages suffered by Plaintiff as a result of the conduct of the Defendant officers. The conduct of the defendant officers was a direct consequence of policies and practices of Defendant City of New York.

201.  At all times relevant to this complaint, Defendant City of New York, acting through the NYPD, had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual defendants, and were a direct and proximate cause of the damages and injuries complained of herein.

202. At all times relevant to this complaint, Defendant City of New York, acting through its police department, and through the individual defendants, had policies, practices, customs, and usages of encouraging and or tacitly sanctioning the violation of citizen's constitutional rights including but not limited to policies, practices and customs of conducting constitutionally deficient investigations; physically, psychologically, improper interrogations of witnesses, suspects and arrestees in order to obtain coerced and fabricated confessions.

69

203. Defendant City of New York failed to supervise its officers and detectives in conducting constitutionally sound investigations, ensuring that proper protocols and constitutional due process requirements were followed to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted. Officers were aware that the supervision was lax and therefore they were free to deviate from the norms and requirements of law and decency.

204. The existence of these unconstitutional customs and policies, specifically as it relates to interrogations and confessions, is evidenced by the countless repeated occurrences of similar exonerations based on false confessions over the past ten years.

205. As a result of the above described policies and customs, officers of the City of New York, including the defendant officers and detectives believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would instead be tolerated and/or undiscovered.

206.  Prior to Plaintiff's arrest, and during the course of his prosecution, policymaking officials at the NYPD, including but not limited to the New York City Police Commissioner, and policymaking officials at the KCDA's Office, including but not limited to the District Attorney, acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duties of police to (1) not falsify/manufacture evidence, and (2) to not fail to disclose exculpatory evidence/Brady material to prosecutors and/or defendants, and to provide truthful information to prosecutors about their knowledge of criminal investigations (3) duties of members of the

district attorney office  to make timely disclosure to criminal defendants of *Brady*

material, and to avoid the elicitation of perjurious and/or fabricated testimony.

207.  Prior to Plaintiff's arrest, and during the course of his prosecution, violations of

these constitutional duties were widespread throughout the NYPD and KCDA's Office.

Through their inaction and failure to address them, policymaking officials at the NYPD

and KCDA's Office constructively acquiesced in the widespread violations of these

constitutional duties by their subordinates.

208. Policymakers at the NYPD and KCDA's Office knew or should have known, to a

moral certainty, that(1) NYPD members had the capacity to falsify/manufacture evidence

and withhold exculpatory evidence/Brady material from prosecutors and/or defendants,

and  (2) prosecutors would be in possession of *Brady* material, would interview

witnesses, and would elicit their testimony before juries; that such issues presented

employees with difficult choices of the sort that instruction, training, and supervision

would have make less difficult; that the need for further instruction, training, supervision

and discipline was demonstrated by a history of employees mishandling such situations;

and that wrong choices by employees concerning these activities would frequently cause

violations of the constitutional rights of criminal suspects and the accused and cause them

constitutional injury. Yet policymakers at the NYPD and DA failed to provide adequate

training and discipline to avoid such violations.

209. This acquiescence by policymakers and their failure to train or discipline their

subordinates directly, proximately, and substantially caused violations of Plaintiff's due

process rights.

210. Due to the Defendants' wrongful policies, practices, customs and/or usages complained of herein, demonstrated a deliberate indifference on the part of policymakers of the City of New York to the constitutional rights of persons within the city, and were the proximate cause of Plaintiff's false arrest, malicious prosecution, wrongful conviction and imprisonment for almost twenty nine years and the other grievous and continuing damages and injuries he suffered, set forth in ¶168 of this complaint.

## SEVENTH CAUSE OF ACTION

### False Arrest and Malicious Prosecution Under State Law

211.    Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 210 of this Complaint.

212    By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

213    Plaintiff's arrest and custody was without probable cause.

214    Notwithstanding the obtaining of an indictment in this matter, the arrest and prosecution were void from the outset as the defendants had no probable cause to arrest and detain Plaintiff.

215    The obtained indictment was tainted by the presentation of false, misleading and incomplete evidence as well as by the withholding of exculpatory evidence.

216    The criminal proceedings terminated in Plaintiff's favor.

217     There was no probable cause for the commencement or for the continuation of the criminal proceedings, yet the defendants continued the prosecution of the Plaintiff.

218     The Defendants acted with actual knowledge of the baselessness of the charges and prosecution and acted with actual malice. Alternatively, the defendants acted with deliberate and reckless indifference to the truth.

219.    The individual defendants all acted under color of State law at the time of their actions. The Defendant The City of New York is responsible for the acts and omissions of the individual defendants under the doctrine of respondeat superior.

220.    By reason of the foregoing, Plaintiff was damaged as described in paragraph 168 of this complaint and was otherwise damaged, all to her detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS along with interest, cost and disbursements and such other and further relief as the court deems just and proper.

## JURY DEMAND

221.  Plaintiff hereby demands a trial by jury on all of the above causes of action

## DAMAGES DEMANDED

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

        a. For compensatory damages of FIFTY MILLION ($50,000,000.00) DOLLARS;

        b. For punitive damages against the individual Defendants;

        c. For reasonable attorneys' fees, together with the costs and disbursements pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

        d. For pre-judgment interest, costs and disbursements as allowed by law;

e. For such other and further relief as this Court may deem just and proper.

Dated: January 7, 2016
Mineola, New York                           CUOMO LLC

                                            Attorneys for Plaintiff
                                            **/s/ Oscar Michelen /s/**

                                            By: Oscar Michelen(OM 5199)
                                             200 Old Country Road
                                             Mineola, New York 11501
                                             (516) 741-3222
                                              omichelen@cuomollc.com

74